Russell T. LUND, Jr., Lund's Inc., and Wardwell M. Montgomery, Plaintiffs,

v.

CHEMICAL BANK, Defendant.

CHEMICAL BANK, Defendant and Third-Party Plaintiff,

v.

LAIDLAW ADAMS & PECK, INC., Third-Party Defendant.

No. 84 Civ. 1621 (RWS).

United States District Court, S.D. New York.

June 15, 1987.

As Amended July 6, 1987.

Parker Chapin Flattau & Klimpl, New York City, for plaintiffs; Stephen G. Rinehart, of counsel.

Kenneth J. Kelly, Asst. Gen. Counsel, New York City, for defendant; Thomas W. Cullen, Senior Counsel.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Third-Party Defendant; Jonathan C. Thau, Lawrence G. Nusbaum, III, of counsel.

SWEET, District Judge.

In this action to recover the face amount of three checks which plaintiffs claim were paid over forged endorsements, third-party defendant Laidlaw Adams & Peck, Inc. ("Laidlaw") has moved for summary judgment. Plaintiffs Russell T. Lund, Jr. ("Lund"), Lund's, Inc. ("Lund's, Inc.") and Wardwell M. Montgomery ("Montgomery") have cross-moved for summary judgment, as has defendant and third-party plaintiff Chemical Bank ("Chemical").

For the following reasons, the motions for summary judgment are granted in part and denied in part, Chemical's motion is denied, and the plaintiffs' motion is granted in part and denied in part. Summary judgment is granted in favor of Chemical on the Rubin/Lund check and in favor of plaintiffs on the Lund's, Inc. and Montgomery/Karki checks.

*The Facts*

The following facts are undisputed.

At all times relevant to this action, Lund was an officer, director and shareholder of Flight Transportation Corporation ("FTC"), a Minnesota corporation engaged in the business of providing aircraft charter and general aviation services. FTC ceased doing business on or about June 18, 1982, when it was placed into receivership on the application of the Securities and Exchange Commission. Montgomery was also a director, shareholder and (until 1979) an officer of FTC. Lund's, Inc. is a privately held Minnesota corporation engaged in the retail food business. Lund is a shareholder and officer of Lund's, Inc.

William Rubin ("Rubin") joined FTC in 1978 as a consultant, then became chairman of FTC in 1978 and president in 1979. Rubin ran the day-to-day operations of FTC and coordinated its periodic offerings of stock to the public. In addition, Rubin purchased several aircraft with Lund, including a Learjet 25D and a Learjet 28.

To facilitate their purchases, Lund and Rubin opened joint bank accounts entitled "Rubin and Lund Jet Account," through which Lund and Rubin each possessed the independent right to write checks. Lund never wrote checks against the accounts, nor did he ever inspect the bank statements prior to June 18, 1982, nor question Rubin regarding the balances, the amount of the checks Rubin was writing, the purpose of the checks, or the dollar amounts. Although Lund contributed substantial funds toward the purchase of the aircraft and co-signed with Rubin loan agreements, Rubin selected the aircraft for purchase, negotiated the leases, received the lease payments, and made loan and maintenance payments. The jointly-owned aircraft earned for both Rubin and Lund investment tax credit.

Janet Karki ("Karki") was, at all relevant times, FTC's corporate secretary. In addition, she co-owned, with Montgomery, a Cessna P210 aircraft.

In 1980, FTC, looking to obtain additional capital, retained Laidlaw, a New York underwriter, to act as co-manager of a public offering. Prior to this offering, Lund, Montgomery and Rubin proposed various transactions with FTC by which FTC was to purchase aircraft owned by one or more of the plaintiffs and Rubin or Karki. The parties planned that the public offering and the aircraft sales would close simultaneously, and details of the proposed transactions were disclosed in the prospectus. On March 9, 1981, the public offering closed. Rubin and Karki were present at the closing, but neither Lund, Montgomery nor a representative of Lund's, Inc. attended.

The three checks at issue here were drawn by Laidlaw on Chemical Bank and are dated March 9, 1981. All three checks were made payable to the order of FTC. The check numbers and face amounts are. as follows:

| Check | Amount |
| --- | --- |
| 56863 | $716,946.00 |
| 56853 | 400,000.00 |
| 56854 | 46,034.00 |

The checks represented part of the proceeds of the March, 1981 public offering. The three checks issued by Laidlaw were properly endorsed by FTC by its secretary, Karki, who then endorsed the checks as follows:

| Check | Indorsees |
| --- | --- |
| 56863 | Russell T. Lund and William Rubin |
| 56853 | Lund's Inc. |
| 56854 | Wardwell M. Montgomery and Janet Karki |

The checks were endorsed to these individuals pursuant to the aircraft transactions discussed above. Specifically, the $716,946 check represented payment for two aircraft jointly owned by Lund and Rubin: a Learjet 25D and a Learjet 28. The $400,000 check represented payment for a Mitsubishi aircraft owned by Lund's, Inc. The $46,034 check represented payment for the Cessna P210 aircraft jointly owned by Montgomery and Karki. Although Lund, Lund's, Inc. and Montgomery had previously agreed to sell the aircraft to FTC or an affiliated company, they were unaware of the dates or details of the transactions and did not know that checks

representing the proceeds of the sales had changed hands at the March 9 closing. Rubin never advised plaintiffs that the transactions had taken place at the closing, and never told them about the disposition of the cash proceeds.

Karki, as co-owner, endorsed the Karki/Montgomery check. Then Rubin took the three checks in question and endorsed each as "attorney in fact" for the plaintiffs. In order to facilitate the scam, Rubin presented three documents dated March 7, 1981 purporting to be "power of attorney" forms signed by Lund, Lund's, Inc. and Montgomery giving Rubin the authority to endorse and negotiate the checks. All parties to this action apparently agree that none of the plaintiffs signed the forms and that the signatures thereon are therefore false. Rubin endorsed each of the checks and negotiated them back to Laidlaw for his private purchase of FTC securities. Laidlaw then deposited the checks at its bank, Chemical. Plaintiffs never received the stock or the cash proceeds of the transfers and have lost their ownership interests in the aircraft.

In June, 1982, the Securities and Exchange Commission (the "SEC") commenced an action against FTC, asserting that FTC and certain of its officers and directors, including Rubin, had engaged in a massive fraud on the investing public. As a result of the investigation, FTC was declared bankrupt, placed into receivership, and its assets were eventually distributed to creditors of and investors in FTC. Rubin and Karki were sent to prison for their part in that fraud.

### Prior Proceedings

After FTC filed for bankruptcy, investors and creditors of FTC commenced a number of lawsuits against FTC, Rubin, its officers and directors, auditors, attorneys, and underwriters who had been involved in the various public offerings of FTC securities. These actions were consolidated into a multidistrict action before the Honorable Charles Weiner. In *Lund v. Flight Transportation Corp.*, 669 F.Supp. 284 (D.Minn. 1985), a case involving Rubin's forgery of Lund's endorsement on a check other than the three checks involved in this case, Judge Weiner concluded after a bench trial that Rubin and Lund were partners with respect to the ownership of six aircraft, including the Learjets at issue here.

On or about March 7, 1984, prior to the conclusion of Lund's suit before Judge Weiner, plaintiffs commenced this action by serving a summons and complaint upon Chemical alleging that Chemical accepted the three checks in question over the plaintiffs' unauthorized endorsements.

Chemical commenced a third-party action against Laidlaw seeking indemnity for breach of warranty of endorsement. By endorsing the checks, Chemical alleges, Laidlaw warranted that all signatures on the checks were authorized and is, therefore, liable for Chemical's loss.

Laidlaw and Chemical have moved for summary judgment dismissing plaintiffs' complaint, and plaintiffs have cross-moved for summary judgment against Chemical, and Chemical has moved for summary judgment with respect to the Rubin/Lund's, Inc. check only. Oral argument was heard on March 13, 1987 and all submissions were received by March 23.

### Summary Judgment

In order to grant summary judgment, this court must conclude that no genuine issue of material fact exists. *See* Fed.R. Civ.P. 56(c). In other words, the inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The standard is the same as that for a directed verdict:

> whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Id.*, 106 S.Ct. at 2512. Summary judgment permits a court to "streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litiga-

tion." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986).

*Conversion Under U.C.C. § 3-419*

Plaintiffs base their claims against Chemical on U.C.C. § 3-419 of the Uniform Commercial Code (U.C.C.), which provides in relevant part:

(1) An instrument is converted when

. . . . .

(c) it is paid on a forged indorsement.

Chemical's liability to plaintiffs is therefore contingent upon a finding that Chemical paid the checks over unauthorized or forged endorsements. Since it is undisputed that Chemical paid the checks, the first question raised by the papers is whether Rubin's signature as "attorney in fact" for each of the three plaintiffs is a "forged indorsement" under U.C.C. § 3-419(1)(c).

*The Rubin/Lund Check*

■ UCC § 3-110 authorizes a partner to endorse checks made payable to the partnership. Laidlaw contends that the Rubin/Lund business relationship constituted a partnership, and, therefore, that Rubin had the authority to endorse the $716,946 check. If he was so authorized, his signature cannot constitute a "forged indorsement" under U.C.C. § 3-419(1)(c).

Lund has previously litigated this issue in another case based on slightly different facts. *Lund v. Flight Transportation Corp.*, 669 F.Supp. 284 (D.Minn.1985), involved Rubin's forgery of Lund's endorsement on a different check. After a bench trial, Judge Weiner concluded that Rubin and Lund were partners with respect to the ownership of six airplanes, including the Learjets connected with the check at issue here, and that Rubin's forgery of Lund's endorsement on a check representing insurance proceeds from the loss of one of the aircraft was therefore authorized.

The court concludes that Lund and Rubin combined their efforts and property to carry on as co-owners a business for profit. First, the element of co-ownership is undisputed. Second, Lund and Rubin engaged "in a series of acts directed toward an end." That is, they purchased six airplanes together and carried out the steps necessary for their leasing and operation with the aim of realizing benefits on their personal income tax returns. Third, each contributed something to the venture and they agreed upon how the benefits derived therefrom were to be divided. The partnership statute required no more than this to establish the existence of a partnership.

*Lund*, 669 F.Supp. at 288.

Judge Weiner then held that since the check was made payable to Rubin and Lund, Rubin as a partner in Rubin/Lund was authorized under the U.C.C. to endorse checks made payable to the partnership.

Lund does not argue that he lacked a full and fair opportunity to litigate the partnership issue before Judge Weiner, or that that determination was not necessary to the case. Instead, he argues that the issues in the two actions are different because false powers of attorney made possible Rubin's forgery of the endorsements here and because Rubin did not deposit the check pursuant to partnership business, as he did in the prior case.

Whether or not Lund is collaterally estopped from relitigating this issue, this court adopts the reasoning of Judge Weiner and concludes that Rubin and Lund were indeed a partnership with respect to the ownership of the aircraft.[1] Although Lund insists that there were no partnership agreements or documents, he has not refuted the evidence that demonstrates that he and Rubin were acting as partners with respect to the Learjets for which the $716,946 check was written.

Under Minnesota law, a partnership is defined as:

[a]n association of two or more persons to carry on as co-owners of a business for profit.

Minn.Stat. § 323.02 subd. 8 (1984).

The main indicium of a partnership is the sharing of profits by the parties. Section

---

**1.** The events giving rise to this action occurred in Minnesota. Since both New York and Minnesota have adopted the UCC and the Uniform Partnership Act, however, choice of law is not an issue in this case.

11(4) of Minnesota's Partnership law provides, in pertinent part:

> [t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business.

Minn.Stat. § 323.06(4) (1984).

In this case, Rubin and Lund intended and did share in the profits of their aircraft business. Specifically, the parties jointly participated in several aircraft purchases, facilitating these purchases by providing financing through personal sums and additional borrowed amounts secured by notes. The Rubin/Lund business held the aircraft jointly, co-signed debt instruments to obtain business loans, and maintained joint bank accounts. *See Cyrus v. Cyrus*, 242 Minn. 180, 64 N.W.2d 538 (1954); *Hansen v. Adent*, 238 Minn. 540, 57 N.W.2d 681 (1953).

To defray the aircrafts' purchase prices and expenses, Rubin and Lund then leased the planes to FTC, using the lease sums to pay the aircrafts' costs and expenses. Moreover, by leasing the aircraft to FTC, they retained title to the planes and received favorable tax treatment, including depreciation deductions and investment tax credits.

Lund contends that the power of attorney convincingly refutes any inference that Rubin and Lund intended to carry on a business as partners. Although the parties' intent may be taken into consideration in deciding whether a partnership exists, *see Stewart v. Bowman*, 195 Minn. 543, 263 N.W. 618 (1935); *Keen v. Jason*, 19 Misc.2d 538, 187 N.Y.S.2d 825 (Sup.Ct.1959), *aff'd*, 11 A.D.2d 1039, 207 N.Y.S.2d 1001 (2d Dep't 1960), Rubin's proffer of the power of attorney says little about the intent of Rubin and Lund through the course of their business relationship.

Finally, Lund argues that even if Lund and Rubin are found to be partners, Rubin's conduct with respect to the $716,946 check was patently unauthorized, thus rendering his signature on the check invalid. It is beyond dispute that Rubin's actions violated fundamental tenets of partnership law. Nevertheless, it does not follow that Rubin's signature as "attorney in fact" is therefore a forged endorsement for purposes of UCC § 3–419(1)(c). Lund has cited no authority to this effect, and reason dictates the opposite result. Imposing liability on a bank when a signer is authorized to sign the check would require the bank to do more than investigate the authority of the signer; instead, the bank would have to investigate the circumstances of each transaction. While a partner is in a position to check on the actions of his partners, this task would be onerous for a bank. From the endorsements on the back of the check, it was impossible for Chemical to discern that Rubin was using money of the partnership to pay for stock in his individual name. As long as the endorser is authorized by law to endorse the check, the use to which that check is put is irrelevant to the drawee's liability. *See Link v. First Nat'l Bank*, 312 Ill.App. 502, 38 N.E.2d 815 (1942).

In sum, because Rubin and Lund constituted a partnership with respect to the aircraft they jointly owned, Rubin was authorized to endorse the check for the two Learjets on behalf of "Rubin and Lund." For that reason, the check was not paid over a "forged endorsement" under U.C.C. § 3–419(1)(c), and Lund cannot recover. *See Lund*, No. 4–82–1578. Summary judgment is therefore granted on behalf of Chemical with respect to the Rubin/Lund check.

*The Lund's, Inc. and Montgomery Checks*

■ Laidlaw further contends that Rubin and Lund's, Inc. are also partners, since Rubin and Lund are partners and Lund's, Inc. is a mere "alter ego" of Lund. It cites no law in support of this novel position, stating only that Lund owned a 33% interest in Lund's, Inc. and "controlled" the company, as stated in the FTC 1981 prospectus.

Laidlaw has failed to show either that Lund's, Inc. was Lund's alter ego, or that Lund's, Inc. was Rubin's partner with respect to this transaction. Rubin had no interest in the aircraft and no claim to proceeds from its sale. Further, Lund's ownership of 33% of the stock is insuffi-

cient as a matter of law to prove an alter ego theory, *see* 1 Fletcher Cyc. Corp. § 41.35 (Perm.Ed.); *Bartle v. Home Owners Cooperative, Inc.*, 309 N.Y. 103, 127 N.E.2d 832 (1955); *Dember Constr. Corp. v. Staten Island Mall*, 56 A.D.2d 768, 392 N.Y.S.2d 299 (1st Dep't 1977), and the statements in the prospectus are not determinative of this issue.

Even should this court find that Rubin and Lund's, Inc. were partners, the check at issue here was endorsed by Karki to Lund's, Inc. only, and only Lund's, Inc. could have endorsed it further. Under the Code, a partner cannot endorse a check unless it is payable to the partnership. U.C.C. § 3–110. Therefore, Rubin had no authority to sign the $400,000 check on behalf of Lund's, Inc.

Laidlaw does not claim that Rubin and Montgomery were partners or that Rubin was "authorized" to sign for him under any other provision of the Code. Therefore, Rubin also had no authority to sign the $46,034 check on behalf of Karki and Montgomery.

*Delivery as a Prerequisite to an Action for Conversion*

■ Chemical contends that Lund's, Inc. cannot recover the face amount of the $400,000 check because it was never delivered to Lund's, Inc. or to any agent authorized to accept delivery on its behalf. Without delivery, Chemical argues, Lund's, Inc. has no interest in the property alleged to be converted, and, therefore, no cause of action under § 3–419.

In *Slattery & Co. v. National City Bank*, 114 Misc. 48, 186 N.Y.S. 679 (Mun. Ct. N.Y. County 1920), a case decided prior to the adoption of the U.C.C., a check made payable to a particular payee was inadvertently delivered to a different person with a similar name. That person cashed the check and eventually it was honored by the drawee bank. Plaintiff, the real payee (through an assignee) sued the bank. In denying recovery, the Court stated:

> It is well settled that, to support an action for conversion, the plaintiff must have some title or interest in the property alleged to have been converted. Title

to a check passes by indorsement and delivery, or, if the check is payable to bearer, by delivery alone. It appears that the plaintiff's assignor, the alleged proper payee, received nothing, since, instead of being delivered to him, the check was delivered to a third person, and consequently [plaintiff] acquired no title or interest in the check. If this be so, the plaintiff's assignor had no right of action against the defendant for conversion.

114 Misc. at 51–52, 186 N.Y.S. at 681; *see also In re Dulak's Will*, 209 N.Y.S.2d 928 (Surr.Ct.1960); *Grannis v. Stevens*, 216 N.Y. 583, 111 N.E. 263 (1916); *Irving Trust Co. v. Leff*, 253 N.Y. 359, 171 N.E. 569 (1930).

The same analysis has been applied under the U.C.C. Authorities have held that § 3–419(1)(c) requires delivery on the check to the payee as an essential element or condition precedent of the claim. *See Caviness v. Andes & Roberts Bros. Constr. Co.*, 508 S.W.2d 253 (Mo.Ct.App.1974). ("The law has long and uniformly held that delivery is essential to the validity of a bill or note, and the instrument does not come into existence until delivery and acceptance. This rule still holds true under the Uniform Commercial Code, 11 Am. Jur.2d Bills and Notes, § 270, p. 298") (other citations omitted); *City Nat'l Bank v. Wernick*, 368 So.2d 934, 937, 26 U.C.C. Rep. Serv. 444, 449 (Fla.Dist.Ct.App.1979), *cert. denied*, 378 So.2d 350 (Fla. 1979). ("Under the applicable law, [plaintiff] did not acquire rights to the check merely because of the fortuity that her name was written upon it after the words 'pay to the order of . . . .'").

This rule also finds ample support in the treatises. Thus, White and Summers examined the question of "whether a payee who had never had possession of a check has a cause of action under 3–419" and concluded:

> We would argue that the client [payee] has no cause of action in the circumstances. Having never received possession or control of the check, the client should have the same claim against the [drawer] that he has before the check

was drawn. Thus his rights would not have been impaired; he can recover ... under contract or in restitution while the [drawer] and the bank battle out ultimate liability under 3–406, 4–406 and the deposit contract."

*White and Summers Uniform Commercial Code* § 15–4 at p. 588 (2d ed. 1980). The legal requirement of a delivery of a check as a condition precedent to a right to bring an action in conversion and the effect of the absolute defense of nondelivery are fully discussed in 6 *Bank Law* §§ 113.01 through 113.04. *See generally* H. Bailey & R. Hagedorn, *Brady on Bank Checks*, Chapter 5 (5th ed. Cum.Supp. No. 3 1986).

While this line of cases holds that delivery is a prerequisite to an action in conversion under § 3–419, there is a second line of cases holding that delivery is not necessary to such an action. In *United States v. Bankers Trust Co.*, 17 U.C.C. Rep. Serv. 136 (E.D.N.Y.1975), the district court stated that:

> Conversion by payment on a forged endorsement is not a possessory action, as Chase [Manhattan Bank] seems to assert. Banks would frequently escape liability for payment on a forged endorsement if it was necessary to show that the check had in fact come into the hands of the payee. It is sufficient that [plaintiff] was entitled to the check as payment of a fire loss under a policy for its benefit, and that the banks instead paid it to [the forger] or his corporation.

*Id.* at 141.

Cases in other jurisdictions are in accord with *Bankers Trust.* Thus, in *Burks Drywall, Inc. v. Washington Bank and Trust Co.*, 110 Ill.App.3d 569, 66 Ill.Dec. 222, 442 N.E.2d 648 (1982), the court upheld the entry of summary judgment in favor of plaintiff payees against the defendant bank under U.C.C. 3–419, and in doing so explicated that section as follows:

> A review of the case law reveals that the elements of a cause of action for conversion under Section 3–419(1)(c) of the U.C.C. and prior law are plaintiffs' ownership of, interest in or right to possession of the check; plaintiffs' forged or

unauthorized endorsements on the check; and defendant bank's unauthorized cashing of the check ... The right to possession of the check is sufficient and actual possession is not required. (*Justus Co. v. Gary Wheaton Bank* (N.D.Ill.1981), 509 F.Supp. 103, 106; *Crane v. Mercantile Trust & Savings Bank* (1920), 295 Ill. 375, 377, 129 N.E. 120, 120; *Smith v. General Casualty Co.*, (1979), 75 Ill. App.3d 971, 974 [31 Ill.Dec. 602, 604] 394 N.E.2d 804, 806; *Hoffman v. First National Bank* (1939), 299 Ill.App. 290, 295–96, 20 N.E.2d 121, 123.) It has also been held under the U.C.C. that even if there is no enforceable obligation between the drawer and payee of a check, the drawee or collecting bank is still liable to such payee if it pays a check over the payee's forged endorsement. *Trust Co. v. First National Bank*, 241 Ga. 406, 407–08, 246 S.E.2d 282, 283–84 (1978).

442 N.E.2d at 652; *accord, Thornton & Co. v. Gwinnett Bank & Trust Co.*, 151 Ga.App. 641, 260 S.E.2d 765 (1979); *Allen v. M. Mendelsohn & Son*, 207 Ala. 527, 93 So. 416 (1922); *Indiana National Bank v. Holtsclaw*, 98 Ind. 85 (1884); *see also Capital Dist. Tel. Employees Fed. Credit Union v. Berthiaume*, 105 Misc.2d 529, 536, 432 N.Y.S.2d 435 (Sup.Ct.1980) (summary judgment granted to plaintiff credit union for payment of check over a missing endorsement "because [defendant] paid the ... check over a missing endorsement and neither the check nor the proceeds reached plaintiff.").

Chemical argues that these cases are distinguishable because they involve plaintiffs who were joint payees with the person who finally endorsed the checks. Thus, the cases can be explained by a finding of constructive delivery to the plaintiff by delivery to his co-payee. Nevertheless, the cases do not rest on that rationale. In *Burks Drywall*, 110 Ill.App.3d 569, 66 Ill. Dec. 222, 442 N.E.2d 648, for instance, the Court assumes that all payees have a right to possession of the check and that that in itself is sufficient to satisfy the delivery element of a conversion action. 66 Ill.Dec. at 226, 442 N.E.2d at 652. In *Thornton*, 151 Ga.App. 641, 260 N.E.2d 765, a case in

which the plaintiff was the sole payee, the Court held that he could recover in conversion even though he had no right to receive funds from the drawer of the check.

Section 3–419 envisions that the drawee bank will be held liable for payment over a forged endorsement. To grant recovery to a payee who received the check prior to its misappropriation and deny recovery to one who never saw the check would defeat the purpose of the section and create an inequitable distinction in the particular circumstances of this case. While there is a well-settled rule that a check does not become an enforceable obligation until delivery, there is also support for the proposition that a payee can recover from the drawee in conversion even when he has no cause of action against the drawer. *See Burks Drywall*, 110 Ill.App.3d 569, 66 Ill.Dec. 222, 442 N.E.2d 648; *Thornton*, 151 Ga.App. 641, 260 N.E.2d 765. Therefore, this court finds that delivery is not required as a condition for this action in conversion, and denies Chemical's motion for summary judgment on the Lund's, Inc. check.

*Contributory Negligence Under § 3–406*

■ Given the viability of the claims of Lund's, Inc. and Montgomery, the next issue raised by papers is whether U.C.C. § 3–406 presents a defense to a claim of conversion under § 3–419. Section 3–406 provides that:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the attention or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

The Official Comment to this section indicates that § 3–406 derives from case law relating only to the negligence of the "drawer who so negligently draws an instrument as to facilitate its material alteration." Official Comment 1 to U.C.C. § 3–406. The Comment further states that:

[b]y drawing the instrument and "setting it afloat upon a sea of strangers" the maker or drawer voluntarily enters into a relation with later holders which justifies his responsibility. In this respect an instrument so negligently drawn as to facilitate alteration does not differ in principle from an instrument containing blanks which may be filled.

Official Comment 2 to U.C.C. § 3–406. Willier & Hart, in 6E U.C.C. Reporter-Digest, summarize § 3–406 as follows:

The drawer or maker of a check or other negotiable instrument whose negligence "substantially contributes to" a forgery or alteration may not assert its improper payment to establish the payor's liability.

*Accord United States Fidelity & Guaranty Co. v. Federal Reserve Bank*, 620 F.Supp. 361, 372 (S.D.N.Y.1985), *aff'd*, 786 F.2d 77 (2d Cir.1986) ("Section 3–406 ... places a burden of due care on a person well situated to prevent a forgery: the drawer of the check"); *Fidelity & Deposit Co. v. Chemical Bank New York Trust Co.*, 65 Misc.2d 619, 621, 318 N.Y.S.2d 957 (App. Term 1st Dep't 1970), *aff'd mem.*, 39 A.D.2d 1019, 333 N.Y.S.2d 726 (1st Dep't 1972) (3–406 "gives statutory sanction to the duty of a drawer to protect the drawee against forgeries, imposes additional duties on a bank's customer, and will increase the duty of care owed to the drawee by the one who sets the instrument in motion").

Plaintiffs here would not appear to be subject to the provisions of § 3–406, since they were neither the makers nor drawers of the checks in question, nor did they "set the instruments in motion." Nevertheless, some courts, without discussion of the common law roots of § 3–406, have assumed that the contributory negligence defense of § 3–406 may be asserted not only against a drawer but also against a payee in a conversion action. In *Abraham & Co. v. Dollar Savings Bank*, 48 A.D.2d 807, 370 N.Y. S.2d 1 (1st Dep't), *appeal dismissed*, 38 N.Y.2d 795, 381 N.Y.S.2d 870, 345 N.E.2d 342 (1975), to satisfy a debt, the debtor mailed a teller's check to the payee's office where it was wrongly appropriated, the payee's name erased, and a new name in-

serted by the payee's employee. The payee then brought suit against the drawee bank for conversion. In denying the payee's motion for summary judgment, the court noted, without citing to § 3–406, that there remained the issue of whether the payee was negligent in allowing his employee to endorse the check in question.

Similarly, in *Westport Bank & Trust Co. v. Lodge*, 164 Conn. 604, 325 A.2d 222 (1973), an employee forged the payee's signature on various checks. On a suit by the drawee bank to recover overdrafts, the payee counterclaimed, asserting that the drawee cashed her checks over forged signatures.

This time, relying on § 3–406, the court rejected the payee's claims, stating that:

> The [payee], by [her] conduct in trusting [the employee] without checking on her activities and in giving her free and complete access to the checks and statements ... failed to exercise reasonable care and [was] negligent.

*Id.*, 325 A.2d at 228. The court then held that, by negligently contributing to the making of unauthorized signatures, the payee was precluded from asserting the lack of authority against the drawee. *Id.; accord Cooper v. Union Bank*, 9 Cal.3d 371, 507 P.2d 609, 107 Cal.Rptr. 1 (1973); *Trust Co. of Georgia Bank, N.A. v. Port Terminal & Warehousing Co.*, 153 Ga. App. 735, 266 S.E.2d 254 (1980); *Swiss Credit Bank v. Chemical Bank*, 422 F.Supp. 1305, 1307 (S.D.N.Y.1976) (dictum).

No cases have been presented which explicitly hold that a drawee bank may not rely on § 3–406 as a defense to a conversion action. Instead, courts rely on the common law rule that negligence is not a valid defense to conversion. In *Rosenthal v. Manufacturers Hanover Trust Co.*, 30 A.D.2d 650, 291 N.Y.S.2d 19 (1st Dep't 1968), the payee brought an action against a bank for conversion of checks upon which the payee's employee, Pincus, placed unauthorized endorsements. The court struck

the affirmative defenses of contributory negligence for failure to supervise Pincus on the grounds that "such defenses, grounded in negligence, are insufficient as defenses to this action brought on the theory of conversion." *Id.*, 291 N.Y.S.2d at 20 (citing *People v. Bank of No. America*, 75 N.Y. 547, 561; *People's Trust Co. v. Smith*, 215 N.Y. 488, 109 N.E. 561; *Bunge Corp. v. Manufacturers Hanover Trust Co.*, 28 A.D.2d 842, 281 N.Y.S.2d 711); *accord Bunge Corp. v. Manufacturers Hanover Trust Co.*, 65 Misc.2d 829, 842, 318 N.Y.S.2d 819 (Sup.Ct.), *modified on other grounds*, 37 A.D.2d 409, 325 N.Y.S.2d 983 (1st Dep't 1971), *aff'd*, 31 N.Y.2d 223, 335 N.Y.S.2d 412, 286 N.E.2d 903 (1972); *Doall Dallas Co. v. Trinity Nat'l Bank*, 498 S.W.2d 396, 402 (Tex.Ct.App.1973) (in action for negligence and conversion against bank which accepted for deposit to the account of plaintiff's employee checks made payable to plaintiff on which employee had forged plaintiff's endorsements, plaintiff's alleged contributory negligence in failing to properly supervise the employee or discover the loss is not a valid defense to liability for conversion); *see also Matco Tools Corp. v. Pontiac State Bank*, 614 F.Supp. 1059, 1066 n. 4 (E.D.Mich.1985) (recognizing authority that the contributory negligence defense of § 3–406 can never be asserted in a conversion action, but declining to decide the issue).

Thus, given the common law rule that contributory negligence is not a defense to liability for conversion, and the failure of § 3–406 to change that rule with respect to anyone other than the drawer or maker of the check, the common law rule should govern here. *Cf.* U.C.C. § 1–103 ("Unless displaced by the particular provisions of this Act, the principles of law and equity ... shall supplement its provisions"). Therefore, Chemical cannot assert the contributory negligence defense of § 3–406 against the plaintiffs here.[2]

---

2. Even if Chemical could assert such a defense, Laidlaw's motion for summary judgment on that issue would still be denied. Under § 3–406, a negligent plaintiff is precluded from asserting a lack of authority against a drawee "who pays

the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." U.C.C. § 3–406. Neither party has, as a matter of law, demonstrated the reasonableness or unreason-

*Measure of Damages*

U.C.C. §§ 3–419(2), provides that:

In an action against a drawee under subsection (1), the measure of the drawee's liability is the face amount of the instrument. In any other action under subsection (1), the measure of liability is presumed to be the face amount of the instrument.

The Official Comment distinguishes between "drawee" banks and others:

4. ... [Subsection (2)] adopts the rule generally applied to the conversion of negotiable instruments, that the obligation of any party on the instrument is presumed ... to be worth its face value.... In the case of the drawee, however, the presumption is replaced by a rule of absolute liability.

Official Comment 4 to U.C.C. § 3–419.

 Chemical's protestations to the contrary, a plaintiff who prevails against a drawee under § 3–419 (1)(c) is entitled to the face amount of the check, even where there are joint payees. *See, e.g., Stapleton v. First Security Bank,* 711 P.2d 1364, 42 U.C.C. Rep. Serv. 493, 495–96 (Mont.1985) (and cases cited therein). Similarly, courts have rejected defenses based upon the lack of consideration or other substantive defenses relating to the underlying transactions. *See Pacific Metals Co. v. Tracy-Collins Bank and Trust Co.,* 21 Utah 2d 400, 446 P.2d 303 (1968); *Trust Co. v. Refrigeration Supplies, Inc.,* 241 Ga. 406, 246 S.E.2d 282, 24 U.C.C. Rep. 646 (1978).

*Laidlaw's Liability*

 Chemical's claim against Laidlaw is straightforward. Upon presentment and transfer of the checks to Chemical, Laidlaw made warranties under U.C.C. § 3–417 and 4–207 that "all signatures are genuine and authorized," and is strictly liable to Chemical for breach of that warranty. *See Iseghohi v. Chase Manhattan Bank,* 106 A.D.2d 491, 483 N.Y.S.2d 30 (2d Dep't 1984); *622 West 113th Street Corp. v. Chemical Bank New York Trust Co.,* 52 Misc.2d 444, 276

N.Y.S.2d 85 (1966). Nevertheless, since Chemical did not formally move for summary judgment on its claim over against Laidlaw, and Laidlaw has not responded to that claim, summary judgment against Laidlaw will be denied at this time.

Summary judgment is granted in favor of Chemical on the Rubin/Lund check, and in favor of plaintiffs on the Lund's, Inc. and Montgomery/Karki checks.

Submit judgment on notice.

IT IS SO ORDERED.

---

ableness of payment in these circumstances, the negligence or reasonable care of the plaintiffs, the good or bad faith of Chemical, or whether

any negligence "substantially contributed" to the forgeries.